1

2

3

4 **IN THE UNITED STATES DISTRICT COURT**

5 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

6

7 DAVID BOSS,                                    CASE NO.  1:04-cv-06424 OWW TAG

8          Plaintiff,                           REPORT AND RECOMMENDATION
                                                TO GRANT  PLAINTIFF'S APPEAL
9                                                 FROM ADMINISTRATIVE DECISION

10         vs.

11 JO ANNE B. BARNHART,
   Commissioner of Social Security,
12
            Defendant.
13 _____/

14

15         Plaintiff David Boss ("claimant") seeks judicial review of an administrative decision

16 denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act

17 ("the Act"), 42 U.S.C. § 401 et seq.  Claimant also asserts, on appeal, that he had filed a concurrent

18 application for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381

19 et seq., an application that was ignored by the Commissioner of Social Security ("the

20 Commissioner").  (Doc. 18, pp. 18-20).

21         Pending before the Court is claimant's appeal from the administrative decision of the

22 Commissioner.  (Doc. 3).  Claimant moved to proceed in forma pauperis on May 14, 2004 (Doc. 1),

23 his motion was granted on June 10, 2004 (Doc. 2) and his complaint was filed on the same day.

24 (Doc. 3).  Claimant submitted his opening brief on June 22, 2005.  (Docs. 17-18).  The

25 Commissioner filed her opposition on August 22, 2005.  (Doc. 22).  Claimant's reply brief was filed

26 on September 21, 2005.  (Doc. 23).

27         Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the Commissioner consented to

28 proceed before a United States Magistrate Judge.  (Docs. 6, 9).  Claimant has not consented.

1

**JURISDICTION**

On May 9, 2002, claimant filed an application for disability insurance benefits under Title II. (Administrative Record ("AR") 67-69).  On the same date, claimant was interviewed and a "Disability Report - Field Office" was prepared which noted a disability onset date of January 1, 1993.  (AR 89-92).[1]  The same document also reported claimant's SSI claim under Title XVI with a protective filing date[2] of April 18, 2002.  (AR 89).  However, despite the Disability Report's report of a Title XVI claim, there is no indication in the record that a signed application for benefits under Title XVI was ever filed as required by 20 C.F.R. § 416.340(c).

Claimant's Title II application was denied initially (AR 53-56) and on reconsideration. (AR 58-61).  On November 12, 2003, Administrative Law Judge ("ALJ") James N. Baker found that claimant was not disabled.  (AR 15-20).  The Appeals Council denied review on March 12, 2004. (AR 5-8).

On May 14, 2004, 63 days after the Appeals Council denied review, claimant lodged a complaint with the District Court (Doc. 3) pursuant to 42 U.S.C. § 405(g) and moved to proceed in forma pauperis.  (Doc. 1).[3]  The 63-day filing period facially violates section 405(g), which states that judicial review is predicated on the filing of a civil action "within sixty days after the mailing" of the notice of decision.  However, the "60-day requirement is not jurisdictional, but rather constitutes a period of limitations."  Bowen v. City of New York, 476 U.S. 467, 478 (1986). Moreover, the Social Security Administration has extended the filing time by regulation to allow a filing within 60 days after the date a claimant *receives* notice of the Appeals Council's final action. 20 C.F.R. § 404.981.  Such notice is presumed to have been received within five days after the date on the notice, 20 C.F.R. § 422.210(c), in which case a claimant has 65 days to file an appeal.

---

[1]  Counsel for claimant later moved to change claimant's Title II onset date to December 31, 1997, the date claimant was last insured under the Act.  (AR 20, 309).

[2]  To qualify as an effective supplemental security income claim, an application for benefits must be submitted on a prescribed form.  20 C.F.R. § 416.305.  However, a written statement indicating a person's intent to claim benefits can, if certain coincident and subsequent requirements are met, establish a protective filing date.  20 C.F.R. § 416.340.

[3]  A complaint is considered filed when it is placed in possession of the clerk of the court.  Cintron v. Union Pac. R.R., 813 F.2d 917, 920 (9th Cir. 1987).  Here, while claimant's complaint was filed on June 10, 2004, it was earlier stamped "RECEIVED" by the clerk of the court on May 14, 2004.  (Doc. 3).

1   Here, claimant timely lodged his appeal on the 63rd day after the Appeals Council's decision.

2                                     **STATEMENT OF FACTS**

3          Claimant was born on November 2, 1946, making him 57 years old at the time of ALJ

4   Baker's decision.  (AR 20, 32).  Claimant testified that he had completed high school plus half a

5   semester at a junior college.  (AR 32).  Beginning in 1967 or 1968, claimant served a tour of duty in

6   the Navy off the coast of Vietnam.  (AR 32-35).  After briefly returning to the United States,

7   claimant served another 11 to 12 months on the Vietnam delta, where he was assigned to a swift boat

8   and saw "plenty" of action and, thereafter, was honorably discharged.  (AR 36-37).[4]

9          Claimant testified that, upon his discharge, he most recently worked for C.W. Rowen

10  Construction for eight or nine years as a labor foreman, supervising about 10 to 15 men.  (AR 39-

11  40).  Claimant's work involved the construction of sewage and water plants.  (AR 39).  One day in

12  1992, according to claimant, when a job was over he simply "went home and [sat] in a chair and

13  didn't get out of it."  (AR 40).[5]  Since that day in 1992, claimant stated that he had been doing

14  "[b]asically nothing" or "[p]retty much nothing" on a daily basis.  (AR 45).  Claimant also testified

15  that he "walked a lot" or "stayed over at [my friend] AC's house a lot."  (Id.).  When not at AC's

16  house, claimant testified that he stayed "[i]n my truck."  (Id.)  To survive, claimant "recycle[d]

17  anything from pallets to tin cans," "mowed lawns," and did other odd jobs.  (AR 47-48).

18         In a handwritten letter submitted in conjunction with the disability filing - but not reported in

19  the ALJ's decision - claimant's friend AC Love stated that he met claimant at a construction job in

20  the early 1970's and they became friends.  (AR 117).  Mr. Love reported that claimant was always a

21  loner and always stayed away from crowds, though he dressed well at the time and had a nice truck.

22  (Id.)  The two drifted apart until one day in the early 1990's, when Mr. Love met claimant while

23  fishing.  As Mr. Love wrote:

24  ///

---

25

26         [4]  Claimant's DD 214H, issued upon his discharge from the Navy, states that he "COMPLETED RVN TOUR."
       (AR 70).

27         [5]  Claimant testified that, though he used drugs in the past , he stopped using them about one or two years before

28  he stopped work.  (AR 41).  However, 1998 Veterans Administration medical records reflect that claimant consumed
    large quantities of alcohol, as much as 1 ½ cases of beer per day.  (AR 296).

1

2          "There were a lot of homeless people down there.  David was about fifty
           yards away from every body [sic].  I was totally suprised [sic] when I saw
           him.  He was dirty and looked like hell.  He was shy like before but more

3          so.  He didn't trust me or anyone else.  I talked him in to coming home
           with me.  I fed him, he took a shower and washed what clothes he had.
           I talked him in to [sic] spending the night.  I told him to take the back

4          bedroom.  Later that night I checked on him.  He was sleeping in the
           corner on the floor. . . . [The next morning] I told him he needed to see

5          a doctor cause his mind was to confused [sic]."  (AR 117).

6          On January 29, 1997, claimant surfaced for the first time at a Veteran's Administration

7    ("VA") center when he walked in "to see if we would help him get [a] driver's license back," for

8    which "he want[ed] a lawyer."  (AR 169).  Claimant reported to the intake person that he had a DUI

9    six years earlier, in 1991, that he lost his driver's license and that, because he worked in construction,

10   this meant he lost his job.  (*Id.*).  Claimant reported that he had not had a job for five (5) years and

11   had no income except for something from a flea market.  (*Id.*)  Intake notes from this visit state that

12   claimant "[d]oes not need mental health services at this time."  (*Id.*)  The notes make no reference to

13   post traumatic stress disorder ("PTSD").

14         Twenty months later, on October 8, 1998, claimant again went to a VA clinic to establish

15   care.  (AR 297).  On this occasion, he was assessed by Caroline Deegan, M.D.  (AR 298).  In

16   reporting claimant's past psychiatric history, Dr. Deegan stated that "[t]he patient is a combat veteran

17   but has never been screened for PTSD.  He does have problems with relationships and also some

18   flashbacks."  (AR 297).  Although not reported in the ALJ's written determination, Dr. Deegan then

19   assessed claimant with "probable PTSD" and directed him to the "Mental Health Clinic for PTSD

20   therapy."  (AR 298).

21         For reasons not in the record, claimant does not appear to have commenced PTSD therapy

22   until 2002, when at about the same time he sought disability benefits from the VA based on PTSD,

23   which the VA immediately granted.  As the VA wrote on June 19, 2002:

24         "The veteran reported in his stressor statement that he was assigned to
           Operation Seafloat which is confirmed by the veterans [sic] service

25         medical records.  The veteran indicated he was assigned with SEAL
           teams as a radioman and went out on river boats where he was exposed

26         to combat ambushes.  This is consistent with the time, place, and
           circumstances of combat for the veterans assigned military occupation.

27
           Treatment records from VAMC Palo Alto show the veteran was seen for

28         an initial intake evaluation for post traumatic stress disorder.  At the

4

intake evaluation, the veteran reported hypervigilance, difficulty with sleeping, trouble concentration [sic], crying, nightmares, and trouble with crowds. . . ."

Treatment note of April 12, 2002 from Dr. Tyler indicates the veterans [sic] post traumatic stress disorder symptoms are interfering with most areas of the veterans [sic] life including work, personal relationships and friendships. Global Assessment of Functioning is 35.

ANALYSIS: Service connection for posttraumatic stress disorder has been established as directly related to military service. This condition is evaluated as 70 percent disabling from April 26, 2002 [the date the claim was received]." (AR 121).

Once the VA found claimant disabled, he began group therapy. Claimant's treating clinical psychologist was Judy Tyler, Psy.D, who submitted the following statement to the Commissioner:

"During combat in Vietnam, David experienced severe combat trauma, which is documented. A verifiable combat trauma is a prerequisite to the diagnosis of PTSD. Furthermore, Mr. Boss' symptoms meet all three diagnostic categories for PTSD: 1) persistent re-experiencing of the combat trauma via nightmares, flashbacks, and intrusive thoughts, 2) attempts to avoid reminders of combat trauma by isolating, drinking alcohol, avoiding talking about it, avoiding veteran holidays, crowds, lines, and Vietnamese people, and 3) physiological hyperarousal including an exaggerated startle response, shaking, and anxiety attacks with rapid heartbeat and increased respiration.

Mr. Boss had all of these symptoms in the 1970's, with varying degrees of intensity and potential interference in his functioning. He managed, like many combat veterans, to minimize his symptoms for a time by both using alcohol and by 'workaholism.' By drinking or drugging, combat veterans are able to 'numb' their powerful emotional reactions of fear, anxiety, depression and rage. By focusing on very hard work, Mr. Boss was able to keep his mind occupied so he minimized flashbacks and intrusive thoughts of Vietnam combat trauma. Like many veterans, Mr. Boss' attempts to cope were eventually overwhelmed by additional stressors and increasing anxiety associated with the PTSD.

All of Mr. Boss' PTSD symptoms began after his return from Vietnam, at least by the early 1970's, and certainly long before December 31, 1997. In fact, Mr. Boss became overwhelmed by his symptoms in 1992, when increasing cognitive disorientation, diminished memory and concentration, and increased irritability with coworkers and supervisors (all indicative of the anxiety associated with PTSD) interfered with the occupational functioning to the point that he could no longer work. . . . Feeling out of control, isolated, and misunderstood and unsupported by others, he further avoided asking for help or applying for benefits or therapeutic help. All of Mr. Boss' reactions and the progression of his PTSD symptoms and increasing interference with his functioning is absolutely predictable for a combat veteran who has experienced severe combat trauma." (AR 311-12).

///

5

1    Beyond diagnosing PTSD, Dr. Tyler also considered whether certain medications might be

2  indicated.  She therefore referred claimant to Barbara A. Vignola, M.D., who wrote the following

3  impressions on December 18, 2002:

4    "[Claimant] was referred by Dr. Tyler, psychologist, and has been
        attending her PTSD group.  He has had three no shows for psychiatric
5        appointments since April.  He states that he has never seen a psychiatrist
        before, but after he left the clinic, I found a note stating that years ago he
6        had a diagnosis of continuous antidepressant abuse.

7        His chief complaint now is sleep disturbance.  He used to have
        nightmares about Vietnam, but this has not been a problem for a whole
8        year. . . .

9        . . . . He seems quite anxious.  He is having a sleep disturbance.  He has
        not been having nightmares.  He avoids crowds because crowds make
10        him feel extremely uncomfortable.  He cannot tolerate shopping in
        grocery stores if he has to wait in line.  He is able to drive but feels
11        uncomfortable driving so drives rarely.  He appears to be somewhat
        dysphoric and possibly mildly depressed.  Impulse control is good. . . .
12        DIAGNOSES: 1. Posttraumatic stress disorder . . . ."  (AR 287-88).

13    Once claimant filed his claim for disability benefits with the Social Security Administration,

14  additional consultative examinations were ordered.  On July 12, 2002, consulting internal medical

15  physician Ralph H. Wood, M.D. diagnosed claimant with "[c]hronic post-traumatic stress disorder."

16  (AR 123).  On January 3, 2003, consulting psychologist Phillip MacFarland, Ph.D., again diagnosed

17  claimant with posttraumatic stress disorder.  (AR 181).  Dr. MacFarland also stated that claimant

18  could not handle his own funds (and would require a payee), could not accept instructions from

19  supervisors or interact appropriately with coworkers, could not maintain regular work attendance

20  without interruptions from his psychiatric condition and could not deal with the usual stress

21  encountered in a competitive work environment.  (AR 181-82).

22                          **SEQUENTIAL EVALUATION PROCESS**

23    The Social Security Act defines "disability" as the "inability to engage in any substantial

24  gainful activity by reason of any medically determinable physical or mental impairment which can be

25  expected to result in death or which has lasted or can be expected to last for a continuous period of

26  not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Act also provides

27  that a claimant shall be determined to be under a disability only if his impairments are of such

28  severity that claimant is not only unable to do his previous work but cannot, considering claimant's

1   age, education and work experiences, engage in any other substantial gainful work which exists in

2   the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

3        The Commissioner has established a five-step sequential evaluation process for determining

4   whether a person is disabled.  20 C.F.R. §§ 404.1520, 416.920.  Step one determines if he is engaged

5   in substantial gainful activities.  If he is, benefits are denied.  20 C.F.R. §§ 404.1520(b),

6   416.920(b).  If he is not, the decision maker proceeds to step two, which determines whether

7   claimant has a medically severe impairment or combination of impairments.  20 C.F.R.

8   §§ 404.1520(c), 416.920(c).

9        If claimant does not have a severe impairment or combination of impairments, the disability

10  claim is denied.  If the impairment is severe, the evaluation proceeds to the third step, which

11  compares claimant's impairment with a number of listed impairments acknowledged by the

12  Commissioner to be so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d),

13  416.920(d); 20 C.F.R. § 404 Subpt. P App. 1.  If the impairment meets or equals one of the listed

14  impairments, claimant is conclusively presumed to be disabled.  If the impairment is not one

15  conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines

16  whether the impairment prevents claimant from performing work he has performed in the past.  If

17  claimant is able to perform his previous work, he is not disabled.  20 C.F.R. §§ 404.1520(e),

18  416.920(e).  If claimant cannot perform this work, the fifth and final step determines whether he is

19  able to perform other work in the national economy in view of his age, education and work

20  experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  *See* <u>Bowen v. Yuckert</u>, 482 U.S. 137 (1987).

21        The initial burden of proof rests upon a claimant to establish a *prima facie* case of entitlement

22  to disability benefits.  <u>Rhinehart v. Finch</u>, 438 F.2d 920, 921 (9th Cir. 1971).  In terms of the five

23  step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is on the

24  claimant as to steps one to four," while at the same time noting that an ALJ's "*affirmative duty* to

25  assist a claimant to develop the record . . . complicates the allocation of burdens" such that "the ALJ

26  shares the burden at each step."  <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 & n.3 (9th Cir. 1999)(italics

27  in original).  The initial burden is met once a claimant establishes that a physical or mental

28  impairment prevents him from engaging in his previous occupation.  The burden then shifts to the

1   Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2)

2   that a "significant number of jobs exist in the national economy" which claimant can perform.

3   Kail v. Heckler, 722 F.2d 1496, 1498 (9th Cir. 1984).

4                                    **STANDARD OF REVIEW**

5          Congress has provided a limited scope of judicial review of a Commissioner's decision.

6   See, 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ,

7   when the determination is not based on legal error and is supported by substantial evidence.  *See*

8   Ukolov v. Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005)("'[w]e may set aside a denial of benefits

9   only if it is not supported by substantial evidence or if it is based on legal error'")(*quoting* Thomas v.

10  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002)); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985);

11  Delgado v. Heckler, 722 F.2d 570, 572 (9th Cir. 1983) ("[t]he [Commissioner's] determination that a

12  claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence")

13  (*citing* 42 U.S.C. § 405(g)).  Substantial evidence is more than a mere scintilla, Sorenson v.

14  Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance.  McAllister v.

15  Sullivan, 888 F.2d 599, 601-602 (9th Cir. 1989); Desrosiers v. Secretary of Health and Human

16  Services, 846 F.2d 573, 576 (9th Cir. 1988).  Substantial evidence "means such evidence as a

17  reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S.

18  389, 401 (1971) (citations omitted).  "[S]uch inferences and conclusions as the [Commissioner] may

19  reasonably draw from the evidence" will also be upheld.  Mark v. Celebrezze, 348 F.2d 289, 293

20  (9th Cir. 1965).  On review, the court considers the record as a whole, not just the evidence

21  supporting the decision of the Commissioner.  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989)

22  (*quoting* Kornock v. Harris, 648 F.2d 525, 526 (9th Cir. 1980)).

23         It is the role of the trier of fact, not this Court, to resolve conflicts in evidence.  Richardson,

24  402 U.S. at 400.  If evidence supports more than one rational interpretation, the Court must uphold

25  the decision of the ALJ.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  Moreover, if there is

26  substantial evidence to support the administrative findings, or if there is conflicting evidence that

27  will support a finding of either disability or nondisability, the finding of the Commissioner is

28  conclusive.  Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Nevertheless, a decision

supported by substantial evidence will still be set aside if the proper legal standards were not applied in weighing the evidence and making the decision.  Brawner v. Secretary of Health and Human Services, 839 F.2d 432, 433 (9th Cir. 1988).

## ALJ'S FINDINGS

### Step One

The ALJ found at step one that claimant had not engaged in any substantial gainful activity since the alleged onset of his disability.  (AR 24, 33).  As noted above, claimant initially alleged a disability onset date of January 1, 1993, although claimant's counsel later moved to change the onset date to December 31, 1997, the date claimant was last insured.  (AR 20, 309).

### Step Two

At step two, the ALJ first noted that claimant was insured for benefits under the Act only though December 31, 1997.  (AR 20).  Upon review of claimant's medical records, all subsequent to December 31, 1997, the ALJ concluded that "while these records may well indicate that the claimant could be currently disabled, they in no way establish that the claimant had a severe impairment prior to December 31, 1997."  (AR 19).

### Steps Three through Five

Having concluded at step two that claimant's impairment was not severe as of the date he was last insured, the ALJ did not consider the remaining steps in the sequential analysis, but simply held that claimant was not under a disability as defined in the Act.  (AR 20).

## ISSUES

Claimant's Opening Brief raised the following issues for consideration:

A.  Whether the ALJ erroneously failed to consider lay evidence.

B.  Whether the ALJ erroneously failed to develop the record regarding onset.

C.  Whether the ALJ erroneously disregarded the retrospective diagnosis of claimant's treating physician.

D.  Whether the ALJ properly developed the record pertaining to claimant's alleged SSI claim.

This Court must uphold the Commissioner's determination that claimant is not disabled if the

1    Commissioner applied the proper legal standards and there is substantial evidence in the record as a

2    whole to support the decision.

3                                          **DISCUSSION**

4    **A.      Failure to Consider Lay Evidence**

5           Claimant asserts that the ALJ erroneously failed to consider lay evidence submitted by

6    claimant's friend, Mr. AC Love.  (Doc. 18 at pp. 15-17).  The substance of that evidence - which

7    pertained to Mr. Love's observations of claimant's conduct and mental status prior to 1998 - was

8    described in the Statement of Facts, *supra*.

9           Claimant is correct.  Lay witness testimony provides an important source of information

10   about a claimant's disability, and is properly rejected only "by giving specific reasons germane to

11   each witness."  Regennitter v. Commissioner of Social Security Administration, 166 F.3d 1294,

12   1298 (9th Cir. 1999).  In Regennitter, the Ninth Circuit held that the lay witness testimony of

13   plaintiff's mother was relevant and could be used to corroborate plaintiff's testimony about his

14   physical condition.  *See also*, Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1966) ("[d]isregard of

15   the testimony of friends and family members violates 20 C.F.R.§ 404.1513(e)(2)(1991)").

16          The current version of 20 C.F.R. § 404.1513(e)(2) provides that the Commissioner may

17   consider the following evidence to establish the severity of an impairment and how it impacts a

18   claimant's ability to work:

19                    "Other non-medical sources (for example, spouses, parents and other
                      caregivers, siblings, other relatives, friends, neighbors, and clergy)."
20
21   20 C.F.R. § 404.1513(d)(4)(2005).    Lay evidence can be important not only vis-a-vis severity, but

     also - as is central to this case - as to the very onset of a disabling condition in cases where medical
22
     documentation of such onset is lacking.  Social Security Ruling 83-20, which pertains to the onset
23
     determination, anticipates the use of lay evidence as needed:
24
25                    "In some cases, it may be possible, based on the medical evidence to
                      reasonably infer that the onset of a disabling impairment(s) occurred
26                    some time prior to the date of the first recorded medical examination,
                      e.g., the date the claimant stopped working.  How long the disease may
                      be determined to have existed at a disabling level of severity depends on
27                    an informed judgment of the facts in the particular case.  This judgment,
                      however, must have a legitimate medical basis.  At the hearing, the
28                    administrative law judge (ALJ) should call on the services of a medical

                                              10

advisor when onset must be inferred.  If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.  If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in the file and additional relevant evidence is not available, it may be necessary to explore other sources of documentation. *Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition*.  However, before contacting these people, the claimant's permission must be obtained.  The impact  of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record. "

Social Security Ruling 83-20, 1983 WL 31249, at *3 (1983)(italics added).

In this case, Mr. Love's testimony regarding his encounter with claimant prior to 1998 – perhaps the only available lay evidence given the conditions under which claimant was living – may corroborate several medical opinions issued after claimant's date last insured - December 31, 1997 ("DLI").  One such assessment by Caroline Deegan, M.D. – made less than 10 months after the DLI – noted that claimant was "probable PTSD" for which referral to a "Mental Health Clinic for PTSD therapy" was indicated.  (AR 298).  Similar findings were made by other medical providers  over the following years, including by the VA when it found claimant disabled on June 19, 2002 (AR 121), by consulting medical physician Ralph Wood, M.D., on July 12, 2002 (AR 123), by treating psychiatrist Barbara A. Vignola, M.D. on December 18, 2002 (AR 287-88), by consulting psychologist Phillip MacFarland, Ph.D., on January 3, 2003 (AR 181) and by psychologist Judy Tyler, Psy.D., as reported to the Commissioner (after a period of treatment) on August 21, 2003 (AR 311-12).  Dr. Tyler's opinion explicitly stated that claimant's PTSD symptoms substantially preceded his DLI.

Mr. Love's lay testimony potentially corroborates medical evidence already in the record, which both suggests and explicitly states that claimant's PTSD pre-dated the date he was last insured, December 31, 1997.  Accordingly, Mr. Love's testimony is relevant to the course of claimant's condition, and may provide a significant clue as to the onset and progression of claimant's mental disability. A remand is warranted for the Commissioner's consideration of Mr. Love's testimony.

///

11

**B.     Failure to Develop the Record Pertaining to Onset**

Claimant further asserts that the ALJ improperly failed to use a medical advisor to determine the onset of claimant's PTSD.  (Doc. 18 at pp. 13-15).  Claimant is correct.

Social Security Ruling 83-20 specifically states:

> "At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred."

Social Security Ruling 83-20, 1983 WL 31249, at *3 (1983).  Consistent with this regulation, Ninth Circuit law provides that a medical advisor – or even corroborative lay evidence as noted, *supra* – must be called upon when an ambiguity exists as to the onset of disability, particularly in the case of mental disorders.  *E.g.*, Armstrong v. Commissioner of Social Security, 160 F.3d 587, 590 (9th Cir. 1998)("Rather than just inferring an onset date, which would deny a claimant benefits, SSR 83-20 requires that the ALJ create a record which forms a basis for that onset date.  The ALJ can fulfill this responsibility by calling a medical expert or where medical testimony is unhelpful, exploring lay evidence including the testimony of family, friends, or former employers to determine the date of onset"); Morgan v. Sullivan, 945 F.2d 1079, 1082 (9th Cir. 1991)("the ALJ should review the evidence of the onset of mental impairment with the assistance of a medical advisor pursuant to SSR 83-20"); DeLorme v. Sullivan, 924 F.2d 841, 848-49 (9th Cir. 1991)("[i]n the event that the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination.  If medical evidence is not available, then lay evidence may be obtained"); Herrera v. Barnhart, 379 F. Supp. 2d 1103, 1108-09 (C.D. Cal. 2005)("it was especially important for the ALJ to, at a minimum, obtain the testimony of a medical advisor"); Speight v. Apfel, 108 F. Supp. 2d 1087, 1092 (C.D. Cal. 2000)("the ALJ erred at Step Two of the sequential analysis when he failed to call a medical advisor or expert to testify regarding the onset date of plaintiff's depression"); Randall v. Commissioner of Social Security Admin., 61 F. Supp. 2d 1141, 1143-44 (D. Or. 1999)(EAJA fee application granted in context where ALJ misapplied the law by failing to call upon a medical advisor to establish the date of onset); Jones v. Bowen, 660 F. Supp. 197, 204 (N.D. Cal. 1987)("the administrative law judge (ALJ) should call on

12

1    the services of a medical advisor when onset must be inferred”).

2          Here, rather than call upon a medical advisor, the ALJ opined that “it is simply too far a

3    stretch to find disability beginning 1997 or earlier based on the opinion of a practitioner who had not

4    seen the claimant until 2002.” (AR 18).   The ALJ also relied on a VA intake report dated January

5    29, 1997, which stated that claimant “[d]oes not need mental health services at this time.” (AR 18,

6    169).  The January 1997 intake report arose out of claimant’s request for help in obtaining a driver’s

7    license, not medical assistance.

8          When the medical evidence concerning onset date is indefinite, an ALJ is obliged to obtain

9    the services of a medical advisor and all available evidence to infer an onset date. In this case, the

10   medical evidence concerning the onset of Plaintiff’s PTSD is indefinite, ranging from Dr. Tyler’s

11   medical assessment that claimant displayed symptoms of  PTSD from “at least by the early 1970's”

12   (AR 311-12) to Dr. Deegan’s medical diagnosis of “probable PTSD” in October 1998 (AR 298).

13   Accordingly, the ALJ should have caused the issue of onset to be assessed by a medical advisor,  in

14   accordance with the Commissioner’s own rules.  The ALJ’s ’s failure to call upon the services of a

15   medical advisor and to obtain all evidence which is available to make the determination of onset of

16   claimant’s PTSD, warrants a remand to allow consideration of such evidence.

17   **C.      Rejection of Retrospective Diagnosis of Treating Physician**

18          Claimant asserts that the ALJ erred by failing to provide clear and convincing reasons for

19   rejecting Dr. Tyler’s opinion that claimant was disabled prior to December 31, 1997.[6]  (Doc. 18,

20   pp. 10-13).  The Commissioner contends that Dr. Tyler was not claimant’s treating physician prior to

21   March 2002, and thus her opinion is not entitled to any special evidentiary weight. Further, the ALJ

22   contends that Dr. Tyler’s opinion was contradicted by a prior psychological evaluation, and thus the

23   ALJ was not required to articulate any reasons for rejecting Dr. Tyler’s opinion.

24          The ALJ provided three reasons for rejecting Dr. Tyler’s opinion.  First, the ALJ concluded it

25   was “simply too far a stretch to find disability beginning 1997 or earlier based on the opinion of a

26

27          [6]  In a letter dated August 21, 2003, Dr. Tyler opined that claimant experienced severe combat trauma in
     Vietnam, and that his symptoms met all three diagnostic categories for PTSD.  Dr. Tyler also opined that claimant’s
28   symptoms began after his return from Vietnam, at least by the early 1970's and “long before” the DLI of December 31,
     1997. (AR 311-12).

1   practitioner who had not seen the claimant until 2002." (AR 18).  Second, the ALJ determined that

2   Dr. Tyler's opinion   "[i]s also inconsistent with the finding made by the [VA] on January 29, 1997."

3   (AR 18).  Third, the ALJ stated that Dr. Tyler's opinion  "[t]his finding is not contradicted by any of

4   the other medical documents in this case dated after December 31, 1997." (AR 18).  The Court

5   concludes that the ALJ erred when he rejected Dr. Tyler's opinion, for the reasons discussed below.

6          1. Is Dr. Tyler a treating source?

7          Claimant asserts that Dr. Tyler is a treating source and her diagnosis of claimant's mental

8   condition prior to 2002 is entitled to "treating" status.  The Commissioner contends that Dr. Tyler is

9   not a treating source because she did not treat claimant prior to March 2002, thus her opinion

10  pertaining to claimant's condition prior to that date is not entitled to "treating" status.  Claimant is

11  correct.

12         A claimant's own physician or psychologist is a "treating source" for Social Security

13  purposes.  A "treating source" is defined by the Social Security Regulations as follows:

> Treating source means your own physician, psychologist, or other
> acceptable medical source who provides you, or has provided you, with
> medical treatment or evaluation and who has, or has had, an ongoing
> treatment relationship with you. Generally, we will consider that you have
> an ongoing treatment relationship with an acceptable medical source
> when the medical evidence establishes that you see, or have seen, the
> source with a frequency consistent with accepted medical practice for the
> type of treatment and/or evaluation required for your medical
> condition(s). We may consider an acceptable medical source who has
> treated or evaluated you only a few times or only after long intervals (e.g.,
> twice a year) to be your treating source if the nature and frequency of the
> treatment or evaluation is typical for your condition(s). We will not
> consider an acceptable medical source to be your treating source if your
> relationship with the source is not based on your medical need for
> treatment or evaluation, but solely on your need to obtain a report in
> support of your claim for disability. In such a case, we will consider the
> acceptable medical source to be a nontreating source.

23  20 C.F.R. § 404.1502.

24         The Social Security Regulations do not quantify the minimum number or frequency of

25  patient-physician contacts or qualify the nature of such contacts, before a physician is credited  with

26  "treating physician" status.  20 C.F.R. § 404.1502.  Rather, the Regulations require only that the

27  frequency and nature of patient-physician contact be consistent with or typical for the patient's

28

14

1   condition, in order to credit the physician with "treating" status.  Here, Dr. Tyler evaluated and

2   treated claimant, and had an ongoing treatment relationship with him.  Dr. Tyler diagnosed claimant

3   with depression and combat-related PTSD in March 2002, and treated him for those conditions from

4   2002 to 2003.  (AR 94, 311-12).  Claimant's medical records reflect that he had weekly individual

5   psychotherapy with Dr. Tyler, attended group therapy at the VA hospital one time weekly, and "was

6   compliant with psychotherapy as well as his medication for his psychiatric condition."  (AR 84, 179).

7   For example, medical records from July 12, 2002 report that claimant "currently is in a post-

8   traumatic stress disorder clinic in the Veterans' Administration, going to weekly meetings, and doing

9   very well" )  (AR 122).  Nothing in claimant's medical records suggest that the amount, frequency,

10  or nature of the therapy that claimant received from Dr. Tyler was inconsistent with or atypical for

11  the treatment of depression or PTSD.  To the contrary, the evidence reflects that claimant was treated

12  appropriately by Dr. Tyler, and benefitted from the treatment.   Accordingly, the Court concludes that

13  Dr. Tyler is a treating physician and her opinions are entitled to be treated accordingly.

14          2. What weight should be given to Dr. Tyler's opinions?

15          The Social Security Regulations distinguish among the opinions of three types of physicians:

16  (1) those who treat the claimant ("treating physician"); (2) those who examine but do not treat the

17  claimant ("examining physician"); and (3) those who neither examine nor treat the claimant, but

18  review the claimant's medical records ("non-examining physician" or "reviewer"). *See* 20 C.F.R.

19  § 404.1527(d).  The opinions of a treating physician are given  more weight than the opinions of a

20  physician who does not treat the claimant.  *See* <u>Lester v. Chater</u>, 81 F.3d 821, 839 (9th Cir. 1995).

21  However, a treating physician's opinion is not necessarily conclusive as to either a claimant's

22  physical condition or the ultimate issue of disability and may be disregarded, even  where it is not

23  contradicted.  <u>Rodriguez v. Bowen</u>, 876 F.2d 759, 761-62 & n. 7 (9th Cir. 1989).

24          In order to reject a treating physician's opinion which is controverted, the ALJ must provide

25  clear and convincing reasons for doing so.  <u>Lester v. Chater</u>, 81 F.3d at 839.   Even where the

26  opinion of a treating physician is controverted, the ALJ may not reject the treating physician's

27  opinion without providing specific and legitimate reasons supported by substantial evidence in the

28  record. *Id.*; <u>Magallanes v. Bowen</u>, 881 F.2d 747 (9th Cir. 1989).  In general, the ALJ can meet the

1   burden of supporting the decision to reject the treating physician's opinion by providing a detailed

2   summary of the facts and conflicting clinical evidence, along with a reasoned interpretation thereof.

3   Rodriguez v. Bowen, 876 F.2d at 761-62.  Here, the ALJ provided specific reasons why he

4   disregarded Dr. Tyler's opinion of Claimant's pre-DLI condition.  The inquiry is whether the ALJ's

5   reasons were sufficient and supported by the evidence.

6              3.  Is the retrospective nature of Dr. Tyler's opinion a legitimate reason to reject it?

7              The first reason the ALJ gave for rejecting Dr. Tyler's opinion was that "it is simply too far a

8   stretch to find disability beginning 1997 or earlier based on the opinion of a practitioner who had not

9   seen the claimant until 2002." (AR 18).  In other words, the ALJ rejected Dr. Tyler's opinion because

10  it was retrospective.  The fact that Dr. Tyler's opinion was retrospective in nature is not a legitimate

11  reason to reject it,  because retrospective diagnoses may be relevant to findings of past impairment.

12  "Retrospective diagnoses by treating physicians and medical experts . . . are . . . relevant to the

13  determination of a continuously existing disability with onset prior to expiration of insured status."

14  Flaten v. Sec. of Health & Human Services, 44 F.3d 1453, 1461 & n.5 (9th Cir.1995); see also Kemp

15  v. Weinberger, 522 F.2d 967, 969 ( 9th Cir. 1975).  Medical evaluations made after a claimant's

16  insured status has expired are relevant to an evaluation of a preexpiration condition.  Lester v.

17  Chater, 81 F.3d at 832 (citing Smith v. Bowen, 849 F. 2d 1222, 1225 (9th Cir. 1988).

18             The same relevancy principle applies to Dr. Tyler's retrospective diagnosis of claimant's

19  chronic PTSD and his symptoms prior to December 31, 1997.   As noted in the Statement of Facts,

20  supra, Dr. Tyler was claimant's treating clinical psychologist in 2002 and 2003.  Dr.  Tyler opined

21  that claimant's symptoms met all of the diagnostic categories for PTSD, including (1) flashbacks and

22  intrusive thoughts, (2) attempts to avoid reminders of his combat trauma and (3) physiological hyper-

23  arousal including shaking and anxiety attacks.  (AR 287-88, 311-12).  Dr. Tyler also explained how

24  claimant's conduct during the past several decades - "workaholism" followed by alcoholism - was

25  consistent with efforts by other combat veterans to "'numb' their powerful emotional reactions of

26  fear, anxiety, depression and rage," efforts that eventually become "overwhelmed by additional

27  stressors and increasing anxiety associated with the PTSD."  (AR 311-12).  In sum, Dr. Tyler

28  elaborated upon the initial impressions reported by Dr. Deegan, who diagnosed "probable PTSD"

16

1    when she first met with claimant on October 8, 1998 and referred him to the "Mental Health Clinic

2    for PTSD therapy."  (AR 298).  Significantly,  Dr. Tyler opined that "[a]ll of Mr. Boss' PTSD

3    symptoms began after his return from Vietnam, at least by the early 1970's, and certainly long before

4    December 31, 1997."  (AR 311-12).

5           In the context of PTSD, it has been held in other circuits that retrospective medical diagnoses

6    *can* support a finding of past impairment.  Likes v. Callahan, 112 F.3d 189, 190-91 (5th Cir. 1997)

7    (in the context of PTSD, court held that "[r]etrospective medical diagnoses constitute relevant

8    evidence of pre-expiration disability, and properly corroborated retrospective medical diagnoses can

9    be used to establish disability onset dates.  As the ALJ erred in failing to consider the retrospective

10   medical diagnoses and the corroborating lay evidence, the judgment is reversed"); Jones v. Chater,

11   65 F.3d 102, 104 (8th Cir. 1995)(where ALJ "failed to discuss potentially corroborating evidence

12   [of PTSD] from relatives who knew [claimant] before his alleged onset date," the court held that it

13   was "unable to determine" whether the ALJ's rejection of "provocative medical diagnoses

14   suggesting an impairment during the insured period" was based on substantial evidence, and

15   therefore reversed and remanded "to fill this void in the record").

16          In the Ninth Circuit, while not set forth in the context of PTSD specifically, or corroborating

17   lay evidence generally, it has also been held that "medical evaluations made after the expiration of a

18   claimant's insured status are relevant to an evaluation of his pre-expiration condition."  Smith v.

19   Bowen, 849 F.2d 1222, 1225 (9th Cir. 1988)(citing cases from the Second, Fourth, Seventh, Eighth

20   and Eleventh Circuits).  In Sampson v. Chater, 103 F.3d 918, 920-22 (9th Cir. 1996), the Ninth

21   Circuit overturned the denial of attorney fees in a case where, at the administrative level, an ALJ had

22   failed to consult with a medical advisor as to medical records dating from 9 to 10 years after a

23   claimant's date last insured.  *But see* Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984)

24   (upholding ALJ's rejection of psychiatric report that was based upon reports of other treating

25   physicians and not upon direct post-DLI examination).

26          When, as in this case, the available medical evidence concerning onset is indefinite and it is

27   necessary for the ALJ to make medical inferences to establish an onset date for claimant's disability,

28   it is incumbent upon the ALJ to call upon the services of a medical advisor and to obtain *"all*

1    evidence which is available" to establish a correct onset date.  Herrera v. Barnhart, 379 F. Supp. 2d

2    at 1107, *quoting* Armstrong v. Commissioner of the Social Security Administration , 160 F.3d at 590

3    (quoting DeLorme v. Sullivan, 924 F.2d at 848).   The phrase "all evidence which is available"

4    includes Dr. Tyler's retrospective opinion regarding the onset of claimant's pre-DLI symptoms, not

5    only because it is relevant to claimant's pre-DLI mental condition, but also because it evidences a

6    continuum of disability and is consistent with the post-DLI opinions available in this case.  The ALJ

7    should not simply have discounted Dr. Tyler's diagnosis as a "stretch" (AR 18), but should have

8    presented Dr. Tyler's  opinion – along with other post-DLI opinions available in this case – to a

9    medical advisor (as discussed *supra*).   Accordingly, the ALJ erred when he refused to consider Dr.

10   Tyler's opinion in order to evaluate claimant's preexpiration  condition.

11          4.  Is Dr. Tyler's opinion inconsistent with a prior psychological evaluation, and if so, is that

12   a sufficient reason to reject it?

13          The ALJ's second reason for rejecting Dr. Tyler's opinion was that "it is also inconsistent

14   with the finding made by the Veterans Administration on January 29, 1997." (AR 19).  The Court

15   first considers whether Dr. Tyler's opinion is inconsistent with a prior VA finding.  The finding

16   referred to by the ALJ is contained in a single page of VA medical notes dated January 29, 1997.

17   (AR 169).  These notes document that on January 29, 1997, claimant walked into the VA seeking

18   help to get his driver's license back - not for medical assistance.  (*Id.*).  The notes report that

19   claimant "had no mental health complaints, said he came to VA to see if we would help him get

20   driver's license back (he wants a lawyer)." (*Id.*).  The notes also report that claimant had not used

21   alcohol (ETOH) for about 1 ½ years, attended Alcoholics Anonymous (AA) twice a week, had a

22   history of alcohol abuse and a driving under the influence charge (DUI), lost his driver's license, lost

23   his job, and was unemployed for five years with no income.  (*Id.*).  The notes further  reflect that

24   despite claimant's litany of unfortunate circumstances and events, the VA psychologist who

25   interviewed him on January 29, 1997 formed a single impression of claimant: "Does not need mental

26   health services at this time" and planned to treat him by offering only  "services  as needed in the

27   future." (*Id.*).

28          At first glance, Dr. Tyler's opinion that claimant suffered from PTSD long before December

18

31, 1997,  is inconsistent with the January 29, 1997 impression that claimant "[d]oes not need mental

health services at this time."  (AR 169, 311-12).  However, closer examination causes the

undersigned to conclude that the ALJ failed to give due regard to the entire content and context of

the January 29, 1997 notes,  because in several respects, the notes report symptoms which are

consistent with Dr. Tyler's opinion regarding the nature and onset of claimant's PTSD symptoms.

For example, on January 29, 1997, the VA psychologist noted that claimant did not ask for mental

health services, and found that none were necessary, while at the same time noting claimant's

lengthy unemployment and history of substance abuse.  Dr. Tyler's opinion (AR 311-12) pointed to

claimant's failure to seek mental health services, and his unemployment and substance abuse, as

symptoms of PTSD, to wit:

> "Mr. Boss had all of these [PTSD] symptoms in the 1970's, with varying
> degrees of intensity and potential interference in his functioning.  He
> managed, like many combat veterans, to minimize his symptoms for a
> time by both using alcohol and by 'workaholism.'  By drinking or
> drugging, combat veterans are able to 'numb' their powerful emotional
> reactions of fear, anxiety, depression and rage."  (AR 311).
> ...
>
> All of Mr. Boss' PTSD symptoms began after his return from Vietnam,
> at least by the early 1970's, and certainly long before December 31, 1997.
> In fact, Mr, Boss became overwhelmed by his symptoms in 1992, when
> increasing cognitive disorientation, diminished memory and
> concentration, and increased irritability with coworkers and supervisors
> (all indicative of the anxiety associated with PTSD) interfered with his
> occupational functioning to the point that he could no longer work.
>
> In fact, after Mr. Boss was no longer able to work (an activity which had
> helped him to avoid some PTSD symptoms), the symptoms became
> worse.  He began to drink more to help himself sleep, to avoid
> nightmares, and to numb the fear. He also isolated himself further.
>
> When Mr. Boss stopped drinking, he eliminated another (albeit
> inappropriate ) means of coping with his PTSD, and the symptoms were
> further exacerbated.  Feeling out of control, isolated, and misunderstood
> and unsupported by others, he further avoided asking for help or applying
> for benefits or therapeutic help.  All of Mr. Boss' reactions and the
> progression of his PTSD symptoms and increasing interference with his
> functioning is absolutely predictable for a combat veteran who has
> experienced severe combat trauma.  (AR 311-12).

If Dr. Tyler is correct, claimant's failure to ask for mental health services on January 29,

1997, and his reported history of substance abuse and lengthy unemployment are consistent with a

PTSD diagnosis prior to December 31, 1997.  However, the ALJ's decision does not sufficiently

19

address these issues or analyze the facts and the clinical evidence underlying them, and fails to provide a reasoned interpretation of them.  The circumstances of this case, and the law pertaining to the inference of onset when the medical evidence is indefinite,  require more than a cursory analysis. Accordingly, the Court finds that although Dr. Tyler's opinion that claimant suffered from PTSD before December 31, 1997 is inconsistent with the January 29, 1997 impression that claimant "[d]oes not need mental health services at this time," the ALJ's decision fails to set forth legitimate reasons for rejecting  Dr. Tyler's opinion and the decision to reject Dr. Tyler's opinion was not based on substantial evidence.

     5.  Is the ALJ's decision to disregard Dr. Tyler's opinion consistent with post-DLI medical records, and if so, is that a sufficient reason to reject it?

On page four of his decision, the ALJ provided a third reason for rejecting Dr. Tyler's opinion, i.e.:

> "Furthermore, this finding is not contradicted by any of the other medical documents in this case dated after December 31, 1997." (AR 19).

It is unclear whether "this finding" refers to the ALJ's determination that Dr. Tyler's opinion is a "stretch" or whether "this finding" refers to Dr. Tyler's opinion.  Under either interpretation, what the ALJ appears to say is that Dr. Tyler's opinion (AR 311-12) is without merit and should be rejected because Dr. Tyler is the only medical source to conclude that claimant's PTSD symptoms existed prior to December 31, 1997.

Regardless of whether Dr. Tyler's opinion stands alone in its analysis of claimant's condition prior to December 31, 1997,  the ALJ nonetheless is required to provide sufficient reasons and analysis to reject it.  Here, the ALJ relied on six medical records from 1997, 1998, 2002, and 2003 for his conclusion that "this finding" is consistent with all of the other medical records dated after December 31, 1997.  In chronological order, the earliest records analyzed were the medical notes dated January 29, 1997, discussed above.  (AR 169).  The next were medical records dated October 8, 1998, where Dr. Deegan reported that claimant "had never been screened for PTSD" and "had

1   problems with relationships and flashbacks."[7]  (AR 297).  Following that, the ALJ reviewed

2   Dr. Wood's July 2002 consultative examination, which reported a diagnoses of "chronic PTSD" and

3   a history of substance abuse.

4        The ALJ also considered three additional medical records from 2003: a consultative

5   psychiatric examination conducted by Dr. McFarland, a consultative psychiatric assessment

6   conducted by DDS, and an internal physical examination conducted by Dr. Paul Castner, M.D.

7   Dr. McFarland examined claimant in January 2003 and diagnosed him with  PTSD and dysthmia.

8   (AR 181).  On February 11, 2003, a DDA consulting psychiatrist assessed clamant's mental residual

9   functioning capacity and found he was markedly limited in six areas of mental functioning,

10   moderately limited in one area, had marked difficulties in maintaining social functioning, and noted

11   that "there was insufficient evidence regarding the period before the date last insured of December

12   31, 1997."[8]  (AR 19, 202, 204).   In January 2003, Dr. Castner examined claimant and found that he

13   had no physical complaints or limitations.  (AR 183-87).

14        The ALJ relies on these records for their absence of a pre-DLI diagnosis, to support his

15   decision to reject Dr. Tyler's opinion. The inference is that if claimant had indeed suffered from

16   PTSD prior to December 31, 1997,  these medical records would have said so.  The problem with the

17   ALJ's analysis is that it ignores the portions of the records that either are consistent with a pre-

18   December 31, 1997 PTSD diagnosis or explain its absence.  For example,  the October 8, 1998

19   records report that claimant suffered flashbacks and had never been screened for PTSD.   The lack of

20   screening for PTSD would explain its lack of diagnosis.  Further, the January 31, 1997 records report

21   a history of substance abuse and lengthy  unemployment.  According to Dr. Tyler, substance abuse

22   and unemployment are symptoms of PTSD.  Finally, the DDS consulting psychiatrist's assessment

23   noted that there was insufficient evidence regarding the period before December 31, 1997 to allow

24   him to assess claimant's condition prior to that date.  Rather than consider the details of these

25

26       [7]  The ALJ, as noted earlier, ignored or failed to see Dr. Deegan's additional notes that claimant was "probable PTSD," for which she directed him to a mental health clinic "for PTSD therapy." (AR 298).

27

28       [8]  An additional mental residual functional capacity assessment in the record dated February 7, 2003, shows only moderate social interaction limitations.  (AR 204-05).

1   medical records, the totality of claimant's circumstances, and the likelihood that the lack of pre-DLI

2   medical documentation may well have been caused by claimant's homelessness and PTSD, the ALJ

3   relied on the absenc*e* of documentation to reject Dr. Tyler's opinion. This runs contrary to the ALJ's

4   obligation to create a record which forms a legitimate basis to determine the onset of disability, and

5   to provide a reasoned interpretation of the facts and the clinical evidence. Accordingly, a remand is

6   appropriate to allow the ALJ to more fully develop the record, to evaluate whether claimant suffered

7   PTSD prior to December 31, 1997, and to determine whether it is appropriate to infer an earlier

8   disability date.

9   **D.      Failure to Consider Claimant's Alleged SSI Claim**

10          Claimant contends that the ALJ failed to consider a concurrent application for supplemental

11  security income that claimant allegedly filed under Title XVI of the Act. (Doc. 18, pp. 18-20). This

12  contention is unfounded, because the record reflects that claimant did not file a signed, written

13  application for Title XVI benefits as required by the administrative regulations.

14          On May 9, 2002, claimant was interviewed and caused the Commissioner to complete a

15  "Disability Report - Field Office." (AR 89-92). That report noted claimant's SSI claim under Title

16  XVI. (AR 89). Notwithstanding, a written statement - even one completed on a Social Security

17  Administration questionnaire - does *not* constitute an actual application for benefits. Rather, the

18  written statement only serves to create a potentially earlier date for entitlement to benefits (if

19  awarded) and *must* be followed-up by a *signed* application. The applicable regulation states:

20              "We will use the date a written statement, such as . . . an SSA
                questionnaire or some other writing, is received as a social security office
21              . . . as the filing date of an application for benefits, only if the use of that
                date will result in your eligibility for additional benefits. . . .  In order for
22              us to use your written statement to protect your filing date, the following
                requirements must be met:
23              . . .

24              (c)  An application form signed by you or by a person who may sign an
                application form for you is filed with us within 60 days after the date
25              of a notice we will send telling of the need to file an application."

26  20 C.F.R. §§ 416.340, 416.340(c).

27          The form claimant caused to be completed on May 9, 2002, in which he stated his desire to

28  proceed under Title XVI, may have ccaused the Commissioner to continue to track that potential SSI

22

1   claim over time.  (AR 246, 247, 251).  However, without the follow-up filing of a signed application

2   for SSI benefits, as required by 20 C.F.R. § 416.340(c), there was no Title XVI claim for the ALJ to

3   consider.  Crane v. Shalala, 76 F.3d 251, 255 (9th Cir. 1996)("a claimant must actually file an

4   application [for Title XVI benefits].  [Claimant] made no showing that he ever filed an application.

5   We reject his assertion that the ALJ erred by failing to consider Title XVI benefits").  *See* Smithback

6   v. Sullivan, 899 F.2d 698, 700 (7th Cir. 1990)("the Agency's publications do not authorize waiver of

7   the requirements for a written, signed application," *citing inter alia* section 404.630); Hernandez v.

8   Bowen, No. CV86-5256-KN(P), 1988 WL 252356, at *4 (C.D. Cal. Feb. 7, 1988)(addressing

9   parallel regulation under Title II, court stated that "in order to have the date of a prior written

10  statement serve as the date of an application for benefits, the appropriate application form must be

11  filed with the Social Security Administration").[9]  Accordingly, the undersigned recommends that

12  claimant's complaint with respect to SSI under Title XVI of the Act, 42 U.S.C. § 1381 et seq., be

13  denied.

14              **CONCLUSION AND RECOMMENDATION**

15          For the reasons discussed above, this Court finds error in the ALJ's analysis and that the ALJ

16  improperly concluded claimant is not disabled.  This Court further finds the ALJ's decision is not

17  supported by substantial evidence in the record as a whole and based on proper legal standards.

18  Accordingly, this Court RECOMMENDS:

19          1.      That claimant's social security complaint be GRANTED with respect to the issue of

20

21  _____

22          [9]  It also bears noting that counsel for claimant essentially agreed with the ALJ, at the administrative hearing, that claimant's potential Title XVI benefits were mooted by the fact that he had been awarded veteran's benefits of about $2,000.  (AR 30-31).  Under Title XVI, there can be no award of supplemental security income if one has more income

23  or resources than are permitted.  20 C.F.R. § 416.202(c)-(d) (income and resource limitations generally).  The more "chargeable" income a claimant has, the less SSI benefits he will receive. Guadamuz v. Bowen, 859 F.2d 762, 764

24  (9th Cir. 1988); Ishay v. Barnhart, 383 F.Supp.2d 1199, 1224 n.18 (C.D. Cal. 2005); 42 U.S.C. § 1382 (a)(2).  The administrative regulations explicitly state that chargeable income includes unearned income, and that unearned income, in

25  turn, includes veteran's benefits.  20 C.F.R. § 416.1121(a)('unearned income . . . . includes . . . veteran's benefits").  Once all countable income is determined (including unearned income), the allowable monthly SSI benefit is calculated by

26  subtracting such income from the current benefit rate.  20 C.F.R. § 416.420.  In 2002 - when claimant allegedly applied for SSI benefits - the current benefit rate for individuals was $545 per month, 67 Fed. Reg. 65620 (Oct. 25, 2002).  Since

27  this is substantially less than claimant's veteran's benefits as stated by counsel (*see* AR 30), it is likely that claimant would have had no entitlement to supplemental security income even had he filed a signed application.

28

23

1    disability insurance benefits under Title II of the Act, 42 U.S.C. § 401 et seq., and DENIED with

2    respect to the issue of supplemental security income under Title XVI of the Act, § 42 U.S.C. § 1381

3    et seq.;

4          2.     That the matter be REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for

5    development of the record and further consideration, consistent with this decision, of claimant's

6    status as disabled, including the onset of disability; whether claimant has sufficient residual

7    functional capacity, defined as what an individual can still do, despite limitations, to perform

8    claimant's past work, 20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a); and whether on the basis of

9    claimant's age, education, work experience, and residual functional capacity, claimant can perform

10   any other gainful and substantial work within the economy, 20 C.F.R. § 404.1520(g); and

11         3.     That Judgment be ENTERED for claimant David Boss and against Defendant

12   Jo Anne B. Barnhart.

13         This Report and Recommendation is submitted to the Honorable Oliver W. Wanger, the

14   United States District Judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this

15   Court's Local Rule 72-304.  No later than thirty (30) days after service of this Report and

16   Recommendation, any party may file written objections to this Report and Recommendation with the

17   Court and serve a copy on all parties and the Magistrate Judge and otherwise in compliance with this

18   Court's Local Rule 72-304(b).  Such a document should be captioned "Objections to Magistrate

19   Judge's Report and Recommendation."  Responses to objections shall be filed and served no later

20   than fifteen (15) days after service of the objections and otherwise in compliance with this Court's

21   Local Rule 72-304(d).  A copy of the responses shall be served on the Magistrate Judge.  The District

22   Judge will review the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(c).  The

23   parties are advised that failure to file objections within the specified time may waive the right to

24   appeal the District Judge's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

25

26   IT IS SO ORDERED.

27   Dated:  **July 5, 2006**                                      **/s/ Theresa A. Goldner**
     **j6eb3d**                                                      UNITED STATES MAGISTRATE JUDGE

28